# Foulke *versus* Harding.

A party to a contract acting in violation of his agreement forfeits his right to the consideration, which is entire, where, from the nature of the agreement, the extent of the damages resulting from his conduct are not capable of proof.

A being the proprietor of a newspaper, made a general assignment for the benefit of his creditors. On the next day he made an agreement with B, who was the publisher of another newspaper, to induce as many as he could of the former subscribers to his paper, to take the paper of B, in consideration of which B gave his note to A. These notes were entered in the schedule of A's assignment of the preceding day. A's assignee subsequently issued proposals for a newspaper, having a similar name with A's former paper, to supply the vacancy occasioned by the discontinuance of A's paper, and circulated them by the round book of A's former paper, but no subscriptions were obtained. Held that A's assignee in a suit on the notes was in the situation of A, and that his acts in violation of the agreement with B, which formed the consideration of the notes, constituted a defence. Nor was B required to shew the extent of the damage.

ERROR from the District Court of *Philadelphia :* .

January 16th, assumpsit by the endorsee of two notes against the drawer.

On the trial before Sharswood, P. J., it appeared that the

Messrs. Fry were the proprietors of a newspaper, published three times a week, under the name of the " Country National Gazette," and a daily paper called the "National Gazette."

On the 30th December, 1841, they made a general assignment to Foulke, for the benefit of their creditors.

On the same day they assigned the subscription list of the Daily National Gazette to Beresford, in trust to sell and pay certain scheduled debts.

On the 31st December, the Messrs. Fry entered into agreement with Harding, the defendant, which recited that the Country National Gazette had been discontinued, and that Harding, who was the publisher of another tri-weekly paper, was desirous to furnish his paper to the persons who formerly took the Country National Gazette, and that he agreed to give to the Messrs. Fry $1 50 for each one of the former subscribers of that paper who should be induced by the Messrs. Fry to receive Hardings' paper instead of the Gazette, and should so continue to do until the following April. Harding agreed to give his note for $500 at sixty days, and like securities for the balance on the settlement being made in April.    The Messrs. Fry also agreed to induce as many of the former subscribers to the Country National Gazette as they could to take Harding's paper.

The two notes now sued on were for part of the $500, thus agreed to be paid by Harding.    They were drawn to the order of W. H. Fry, and endorsed by him and by William Foulke, assignee, and were entered in the schedule of the property assigned by the deed of December 30th to Foulke.

On the 31st December, Harding made a contract with Beresford, the assignee of the subscription list of the Daily National Gazette, very nearly similar to that made with the Messrs. Fry.

. In February, 1842, Beresford and Foulke issued proposals for an evening journal, to fill the vacancy occasioned by the extinction of the National Gazette to be called " The Daily National Gazette."    They also advertised that the National Gazette for the country would be issued tri-weekly.

The prospectus for these papers was circulated by the round book of the National Gazette, by authority of Beresford and Foulke, who had been the book-keeper in the office of that paper, but the evidence was that no subscribers were obtained and that Harding used the title of the National Gazette in his paper.

His honor left it to the jury to say whether the notes were given under the agreement of December 31, saying:

" I see nothing in this writing which is like a transfer of the good will of a newspaper.    It was a contract which any body else might have made.    There was nothing in the assignment of the day before to prevent the Messrs. Fry from making or executing this contract with the defendant."

[Foulke *v.* Harding.]

If Wm. Foulke, the plaintiff, as assignee of the Messrs. Fry, did any thing to prevent the defendant from receiving the benefit of the contract, and damage was suffered, then the defence is sustained to the amount of such damage. The question for you will be whether the defendant has suffered to the amount of these notes, or to what amount.

If he has failed to prove the extent of his damage, and he was unable to prove it, it was his misfortune and he must suffer for it.

*J. T. Montgomery and Cadwalader*, for plaintiff in error.

The agreement with Harding was a transfer of the good will of the paper, or it amounted to nothing: *Stor. on Part.* § 99; *Colly on Part. B.* 2 *c.* 1, § 1; *Story on Cont.* § 356. The right to the subscription list had passed by the prior assignment to Foulke, Longman & Tripp, 5 *Bos. & P.* 71: hence the Fry's had either disabled themselves from making the contract as to the subscription list, and their assignee is in the same position as to the notes, 3 *Wh.* 485; or considering the whole transaction as one, the assignee was affected as to the consideration in the same manner as the payee. The consideration was entire and had failed by the acts of the assignee in endeavoring to procure the old subscribers to the new paper under the old name. To prove the extent of damage in such case is impossible, as it is in sales of good will, injuries to credit, &c., and the rule is that it goes to the whole of the consideration, Hitchcock *vs.* Cocker, 6 *Ad. & El.* 438; 5 *W. & S.* 521; 7 *Cow.* 307; 8 *Mass.* 233, 9 id. 530; 1 *Pick.* 468; 17 *Ves.* 334; 4 *Raw.* 36; 6 *T. R.* 320.

*Ingraham*, contra.

There was no such assignment of the good will nor of the subscription list to Foulke. Nor was there any proof that the Messrs. Fry failed in the performance of their agreement. If they had done so, or if Foulke is to be charged with their contract, there was no evidence of damage, for the acts of the plaintiffs were nugatory, the proof being express that they obtained none of the subscribers, nor was the proposed paper to be of the same name with the former one: *Hopk. Cl. R.* 307.

The opinion of the court was delivered by

Rogers, J.—Although suit is brought in the name of William Foulke, as endorsee of William H. Fry, to whose order the note is payable, all the circumstances of the case lead to the conclusion that he stood in no better situation than the assignors, the Messrs. Fry. And this seems to have been the opinion of the Judge who ruled the case. The notes in suit, being part of the assets under the assignment, any defence which would be available against the assignor, is equally so against the present plaintiff, who stands in

their place. An assignee for the benefit of creditors is not a purchaser for a valuable consideration, and, consequently, he stands in no better position than the assignor : Knowles *vs.* Lord, 4 *Wh.* 507; Twelves *vs.* Williams, 3 *Wh.* 485; McCrelish *vs.* Churchman, 4 *R.* 36, and other authorities. Two questions have principally occupied the attention of the court. 1st. As to the construction of the agreement of 31st December, 1841, between the Messrs. Fry and Jasper Harding. 2. The measure of damages, that is the extent of the defence on the amount of damages sustained by the defendant. The learned Judge sees nothing in the writing, but the transfer of the good will of a newspaper. It was a contract, he thought, which any other person might have made. There was nothing in the assignment of the day before to prevent the Messrs. Fry from making or executing this contract with the defendant. Passing by the objection that the ability of the Messrs. Fry to perform their part of the agreement was destroyed by their assignment for the benefit of creditors, made the day before, let us examine the construction put upon the contract. If I understand the court, they are of opinion that, as the Messrs. Fry stand in the same position as any other person who might enter into an agreement to induce the former subscribers of the "Country National Gazette," to receive Harding's "Inquirer and Courrier," they would have the right the next day, for example, to resume and continue the paper as before. Assuming this position to be correct that they stood in no better position than a stranger, which is not so clear, it does not strike me that the conclusion follows that this could have been the intention of the parties. The agreement recites, "The Country National Gazette," published three times a week, heretofore, being discontinued, and Jasper Harding, the publisher of the Inquirer and Courier, a newspaper also published three times a week, being desirous to furnish his newspaper to the persons who formerly took the Country National Gazette, he, Harding, agrees to give to William Fry, J Reese Fry, and Edmund P. Fry, the sum of one dollar and fifty cents for each person of the former subscribers of the National Gazette who shall be induced by them to receive said Harding's Inquirer and Courier, instead of the Country National Gazette, and who shall so continue to receive the same after the date hereof, and until the first of April, 1842, inclusive." Although the Messrs. Fry made no stipulation that they would discontinue the paper, (for it had been already discontinued,) nor do they expressly agree that they will not set up a similar paper, yet, certainly, it never could enter into the contemplation of either party that the Country National Gazette should be received, and carried on as before the agreement, as that would necessarily tend to frustrate the principal object of Harding, which evidently was, by their means and their assistance, to obtain the former subscribers of that paper

[Foulke *v.* Harding.]

for his own.    Setting up a paper by them, or issuing a prospectus for that purpose, which is the same thing, by those who represent them, of a similar name, addressed to the same subscribers, would in my apprehension, be a breach of faith, and such a fraud as avoids the contract.    No person has a right to place himself in a position antagonistical to an agreement made by himself, and if not plainly expressed, yet clearly implied, from the whole tenor of the instrument; Crutwell *vs.* Lye, 17 *Vesey,* jr., 335.

The court further instructs the jury that, if William Foulke, as assignee of the Messrs. Fry, did any thing to prevent the defendant from obtaining the benefit of the contract, and damage was suffered, then the defence is sustained to the amount of such damage, &c.    The charge throws the *onus* of the question of damage on the defendant.

If he has failed to prove the extent of his damages, or if he was unable to prove it, it was his misfortune, and he must suffer for it.    To this part of the charge I cannot assent; for, if Foulke prevented the defendant from receiving the benefit of his contract, which is assumed by the court, and was a question of fact for the jury, the whole consideration, which is an entire consideration, fails, and the plaintiffs are entitled to nothing.    It is difficult, if not impossible for the defendant in such a case to shew the injury he received from the improper interference of the plaintiffs, and the law is not so unreasonable as to require it.    It is their default if they put themselves in a position to defeat the contract, either in whole or in part.    They surely are entitled to no peculiar favor, as they can protect themselves by scrupulously fulfilling their agreement.    In the nature of the case, the precise injury which the defendant might sustain from the breach of the contract, cannot be ascertained.    The measure of damage is the whole amount of the consideration, because if the jury should believe the plaintiffs did not perform their contract, but placed themselves in a position hostile to the agreement, the whole consideration, which is entire, has failed.    For these principles I refer generally to Hitchcock *vs.* Croker, 6 *Adol. & Ellis* 488; 33d *Eng. Com. Law Rep.* 106; 7 *Cowen* 307, Noble *vs.* Bates; and McCrelish *vs.* Churchman, 4 *Rawle* 36.

Judgment reversed and *venire de novo* awarded.